

FILED

JUL 1 2 2017

Clerk, U.S. District Court
District Of Montana
Missoula

John C. Doubek
DOUBEK, PYFER & FOX, PC
307 North Jackson
P.O. Box 236
Helena, MT 59624
Telephone: (406) 442-7830
Facsimile: (406) 442-7839
Email: jdoubek@doubekpyfer.com

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| TIMOTHY L. BLIXSETH | ) | Case No. CV 17-97-m-DWM |
| | ) | |
| Plaintiff, | ) | COMPLAINT FOR: |
| | ) | 1. LEGAL MALPRACTICE; |
| vs. | ) | 2. BREACH OF FIDUCIARY DUTY; |
| | ) | 3. FRAUD; |
| STEPHEN BROWN, an individual; | ) | 4. BREACH OF CONTRACT; |
| GARLINGTON, LOHN & ROBINSON, | ) | 5. EQUITABLE INDEMNIFICATION; |
| PLLP, a Montana professional limited | ) | 6. COMPARATIVE INDEMNITY; |
| liability partnership; DOES | ) | 7. CONTRIBUTION; |
| and ROES 1-100, | ) | 8. MALPRACTICE FOR FAILING |
| | ) | TO DISCLOSE CONFLICT OF |
| Defendants. | ) | INTEREST |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

* * * * * *

-1-

Pursuant to authority granted in the *Order Granting Amended Motion for Leave to Sue Stephen R. Brown and the Law Firm of Garlington, Lohn & Robinson, PLLP, in the U.S. District Court for the District Of Montana*, dated June 7, 2017, United States Bankruptcy Court, District of Montana, in Case No. 08-61570-JDP, Docket No. 2618, Plaintiff files his complaint against the Defendants, as follows:

## INTRODUCTION

1. This action arises out of years of attorney malpractice that was left undiscovered by an attorney engaged in actions which amount to a complete disregard for the fiduciary relationship between an attorney and his client, as well as the Montana Rules of Professional Conduct.

2. As set forth more fully below, the Defendants, Stephen Brown and Garlington, Lohn & Robinson, PLLP, served as Plaintiff's legal counsel for many years, representing him in connection with the creation and operation of Plaintiff's development project known as the Yellowstone Club, loans to and from Yellowstone Mountain Club, LLC ("Yellowstone Club"), handling material aspects of his divorce from his now ex-wife, Edra Blixseth, critical to the conflicts issue in this complaint, and representing Mr. Blixseth in state court litigation arising from the Yellowstone Club.

3.     In short, Mr. Brown's breaches of his absolute duties to Mr. Blixseth of loyalty and trust are virtually unprecedented in legal malpractice cases and violated the most sacred trust that a lawyer owes to his client.  Mr. Brown committed numerous acts that amount to legal malpractice against Mr. Blixseth well before the Yellowstone Mountain Club Bankruptcy and further committed legal malpractice against Mr. Blixseth during the Yellowstone Mountain Club Bankruptcy.  During an adversary proceeding in connection with the Yellowstone Bankruptcy, in an effort to conceal his malpractice, he directly cooperated with Mr. Blixseth's adversaries to conceal his own malpractice and liability to the Yellowstone Club and as requested by said adversaries then fabricated facts and lied under oath to assist those adversaries in obtaining a substantial judgment against Mr. Blixseth.  Mr. Brown's gross malpractice and breaches of his fiduciary and ethical duties to Mr. Blixseth are patently obvious.

4.     Particularly germane to this action, Mr. Brown and Garlington represented Mr. Blixseth in connection with a $375,000,000 loan from Credit Suisse and its related affiliates ("Credit Suisse Loan") to the Yellowstone Club and a concurrent loan of $209,000,000 from the Yellowstone Club to Mr. Blixseth's corporation, Blixseth Group, Inc. ("BGI").  These interrelated loans are hereinafter referred to as the "Credit Suisse Transaction." During his representation of Mr.

Blixseth in the Credit Suisse Transaction, Mr. Brown, among other things, advised

Mr. Blixseth that such a transaction did not violate Montana law, was not a breach

of fiduciary duty, and complied with "all laws." In fact, unbeknownst to Mr.

Blixseth, the Credit Suisse Transaction violated basic lending and appraisal laws

that existed to protect borrowers, such as FIRREA and USPAP.

5.      Despite writing a legal opinion that the Credit Suisse Transaction was

proper under Montana law and advising Mr. Blixseth that such transaction was not

a breach of fiduciary duty and complied with "all laws," over the next three years

after the loan was distributed in reliance on Mr. Brown's legal advise, Defendants,

Mr. Brown and Garlington, extensively represented Mr. Blixseth in connection

with his divorce from his now ex-wife that included among other things, the

creation of a comprehensive Marital Settlement Agreement, ("MSA") which

became effective on July 3, 2008, and negotiated broad general releases for Mr.

Blixseth from BGI and Yellowstone Club that specifically released Mr. Blixseth

from claims arising from his use of the loan proceeds of the Credit Suisse

Transaction and affirmed that Mr. Blixseth's ex-wife assumed full responsibility

for the Credit Suisse Transaction and any claims arising from that transaction.

6.      As is detailed below, Mr. Brown and Garlington committed legal

malpractice against Mr. Blixseth by failing to advise him about the risks associated

with the broad waivers and releases associated with the MSA and that such releases could be subject to being set aside in the future even though such releases were a material component of the MSA.

7.     In addition, in connection with the MSA, Mr. Brown also represented the Yellowstone Club, and negotiated with other third parties regarding *claims against both the Yellowstone Club and Mr. Blixseth, but never advised Mr. Blixseth to obtain separate counsel for the Yellowstone Club.*

8.     As detailed below, well before the Yellowstone bankruptcy, Mr. Brown and Garlington also committed legal malpractice related to Mr. Brown's legal advice in connection with litigation involving Mr. Blixseth and Greg LeMond.

9.     Despite his extensive work for Mr. Blixseth through the years, including the Credit Suisse Transaction, Mr. Blixseth's divorce and the *LeMond* litigation, months after Mr. Blixseth severed ties from the Yellowstone Club, which severance was the result of the MSA and Brown's advice to Mr. Blixseth regarding the same, the Yellowstone Club filed for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code and Garlington was named a member of the Official Unsecured Creditors' Committee ("UCC").  Mr. Brown

became chairman of the UCC, despite his then *ongoing* representation of Mr. Blixseth.

10.    In fact, Brown then used his extensive knowledge of Mr. Blixseth's relationship with the Yellowstone Club, the MSA and the Credit Suisse Transaction to participate in the UCC, and continued to do so even after the UCC brought a lawsuit against Mr. Blixseth based on the alleged impropriety of the loan from Yellowstone Club to BGI, which is the same transaction *that Mr. Brown and Garlington had represented in a legal opinion complied with all Montana laws.*

11.    Equally shocking, Mr. Brown and Garlington knew without any doubt that the UCC claims were released by the very provisions of the MSA that Mr. Brown and Garlington had negotiated and approved for Mr. Blixseth. Even after Mr. Blixseth notified Mr. Brown and Garlington of the overt, actual and unwaivable conflict, and in violation of the Montana Rules of Professional Conduct (see Rules 1.7 and 1.8), Mr. Brown and his firm refused to remedy the conflict and continued to use information they learned while representing Mr. Blixseth (including attorney-client privileged information) to Mr. Blixseth's extreme detriment, including alleged liability for the entirety of the $209,000,000 loan from Yellowstone Club to BGI ("BGI Loan") approved by Mr. Brown and Garlington as part of the Credit Suisse Transaction. Mr. Blixseth accordingly

seeks not only indemnification for any judgment against him in connection with

Credit Suisse Transaction, the bankruptcy and all legal fees incurred in connection

therewith, but also seeks damages for injury to his reputation and lost business

opportunities as a result of the bankruptcy litigation, together with punitive

damages.

12.     To nail the coffin shut, even after the attorneys *for* the Yellowstone

Club, working with attorneys for the unsecured creditors, notified Mr. Brown *in*

*writing* that he had direct unwaivable conflicts and ethical duties to Mr. Blixseth,

which were then reported in the local newspaper, Mr. Brown continued to share

information - *encapsulated in hundreds of emails between themselves*, based on his

prior representation of Mr. Blixseth.  The result of all the foregoing

communications between the Yellowstone Club's and the UCC's lawyers is that

their lawyers collaborated with Mr. Brown for many months; just weeks before his

deposition in the trial involving hundreds of millions of dollars in claims against

Mr. Blixseth, under the direction of the UCC and Yellowstone Club lawyers, Mr.

Brown changed his written opinion.  On April 10, 2009, just two weeks before

trial, Mr. Brown gave sworn testimony in his deposition rejecting his written

opinion that the Credit Suisse Transaction complied with "all laws" thereby

depriving Mr. Blixseth of his advice of counsel defense and simultaneously calling

into doubt the validity of the Credit Suisse Transaction which was a critical element to the claims being asserted against Mr. Blixseth.[1]  Such perfidy has few parallels in malpractice jurisprudence, and conjures up ancient scenes of betrayal. Indeed, Brown's deception toward Mr. Blixseth was compounded by the fact that Brown informed Mr. Blixseth that Brown's position on the UCC would actually be beneficial to Mr. Blixseth because Brown would use that position to protect Mr. Blixseth.  Based upon this representation by Brown to Mr. Blixseth, Mr. Blixseth raised no objection to Browning serving on the UCC until it was too late.  In reality, and unbeknownst to Mr. Blixseth, the situation was the opposite.  As set forth below, while on the UCC, Brown chose his loyalty to his law firm and himself over his loyalty to Mr. Blixseth.  Brown never disclosed to Mr. Blixseth the conflict of interests inherent in Brown serving on the UCC and never disclosed nor had authority from Mr. Blixseth to use information that Brown had learned while representing Mr. Blixseth to Mr. Blixseth's detriment, which Brown did. Moreover, not until it was too late, did Mr. Blixseth realize that Brown's real interest in serving on the UCC was to:  (1) ensure that his firm was paid on its claims for unpaid legal fees owed to it by the Yellowstone Club; and (2) ensure

---

[1] By rejecting his previous written opinion confirming the validity of the Credit Suisse Transaction, Mr. Brown *per se* acknowledged committing legal malpractice toward Mr. Blixseth and the Yellowstone Club when he first issued that written opinion in 2005.

-8-

that Brown and his firm escaped liability for their malpractice in representing the

Yellowstone Club in connection with the Credit Suisse Transaction and the MSA.

13. Brown furthered these interests in complete conflict with his duty of

loyalty to Mr. Blixseth as set forth herein by: (1) soliciting approval of a plan of

reorganization that made Mr. Blixseth the sole litigation target for the Club's

creditors for over $280 million in liability based on transactions for which Brown

had advised Mr. Blixseth, while at the same time, exculpated Brown and his firm

from any liability to the Club; (2) soliciting this plan of reorganization which

called for Brown and his firm to have their claim against the Yellowstone Club

satisfied by CrossHarbor Capital Partners LLC through CrossHarbor's purchase of

that claim through the trade creditor fund, even though this plan contemplated

CrossHarbor then pursuing Mr. Blixseth in litigation to satisfy this claim through

the Yellowstone Club Liquidating Trust; (3) fabricating facts and testimony

concerning Brown and his firm's role in the Credit Suisse Transaction and MSA

for the dual purpose of eliminating critical defenses that Mr. Blixseth had to the

UCC's litigation against and eliminating any liability that Brown and his firm had

to the Yellowstone Club for those transactions; (4) using information he learned

while representing M. Blixseth to assist the UCC in its efforts, which efforts

included obtaining a $280 million judgment against Mr. Blixseth.

## PARTIES

14.     Plaintiff Timothy Blixseth is an individual and is currently a citizen of the State of California.  Plaintiff was, through early July of 2008, the sole shareholder of BGI, an Oregon corporation authorized to do business in Montana. BGI owned approximately 89% of Yellowstone Mountain Club and its affiliate entities.

15.     Defendant Stephen Brown ("Mr. Brown") is a citizen of the State of Montana, member of the Montana State Bar and a partner in defendant Garlington, Lohn & Robinson, PLLP, a Montana law partnership organized under the laws of the State of Montana.  At all times relevant, Mr. Brown was acting as an agent and partner of his law firm, Garlington, Lohn & Robinson, PLLP.

16.     Upon information and belief, Defendant Garlington, Lohn & Robinson, PLLI ("Garlington"), is a Montana Professional Limited Liability partnership organized under the laws of the State of Montana, and whose partners are all citizens of the State of Montana.

17.     Defendants Does and Roes 1-100 are persons and/or entities whose identity is currently unknown to Plaintiff but is alleged to be responsible for the damages suffered by Plaintiff.  Plaintiff will amend his complaint to add the identity of such Does and Roes defendants when discovered.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332

(diversity of citizenship) because Mr. Blixseth has diversity of citizenship from all

Defendants and the amount in controversy exceeds $75,000.

19.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a

substantial part of the events or omissions giving rise to the claims herein occurred

within this District.  Venue is proper in this Division because Mr. Brown and

Garlington reside in and do business in the Missoula Division of this District.

## FACTUAL ALLEGATIONS

20.     Mr. Blixseth established the Yellowstone Club with his former wife,

Edra Blixseth, beginning in approximately 1997-1998.  Mr. Blixseth's vision and

business acumen enabled creation of the Yellowstone Club as the world's only

private ski and golf community.  His blood, sweat, tears, capital and real estate

contributions, risk, assumption of debt, raising of capital and 80 hour work weeks

over a ten year period created the Yellowstone Club.

21.     The Yellowstone Club is a membership-only master planned unit

development, located on 13,500 acres of private land in Madison County,

Montana, which Mr. Blixseth contributed as the basis for the Yellowstone Club.

22.     Under his leadership, the Yellowstone Club sold approximately 439 residential units, more than half its total allowable maximum density.

23.     Mr. Blixseth served as President of BGI and BGI was the Manager of the Yellowstone Club until approximately August 2008, when his former wife, Edra Blixseth, assumed full ownership and control of Yellowstone Club and BGI following the final settlement of their marital dissolution proceedings. Under Plaintiff's management, the Yellowstone Club consistently profited from the sale of real estate and achieved positive net income.

### Credit Suisse Transaction

24.     To further develop the property in accordance with the Yellowstone Club's master plan, and in reliance upon the advice of his lawyer, Mr. Brown, the Yellowstone Club entered into a loan agreement with Credit Suisse First Boston (as administrative and collateral agent for a group of lenders) in September 2005 for $375,000,000. The Credit Suisse Transaction allowed the Yellowstone Club to pay off existing indebtedness of both BGI and the Yellowstone Club, finance future construction and development, and develop a plan to created world-wide membership affiliated with Yellowstone Club known as Yellowstone Club World. Yellowstone Club subsidiaries used a portion of the loan proceeds derived from the Credit Suisse Transaction to purchase properties that remained assets of the

Yellowstone Club, and a portion was transferred out of the Yellowstone Club to BGI in exchange for an interest-bearing Promissory Note that was steadily paid down until control of BGI was transferred to Edra Blixseth on August 13, 2008.

25.    The use of the Credit Suisse Transaction loan proceeds for Yellowstone Club and non-Yellowstone Club related purposes was specifically allowed by the Credit Suisse Transaction and was explicitly approved by Mr. Blixseth's lawyer, Stephen Brown, in numerous discussions with Plaintiff both before and after the loan was made, in an "Opinion Letter" at the time of the Credit Suisse Transaction, in Mr. Blixseth's subsequent defense by Mr. Brown and Garlington in both *LeMond* and the *Snow* litigation, and repeatedly during the course of the Yellowstone Club bankruptcy proceedings.[2]  Mr. Brown remained steadfast in his stance that the 2005 Credit Suisse loan and its uses were legitimate despite the fact that the loan violated US banking laws.

26.    Both the Yellowstone Club and BGI were solvent before and after the Credit Suisse Transaction was competed - as demonstrated by the Yellowstone Club's audited financial statements and BGI's payments of principal and interest on the BGI Loan from the Yellowstone Club. The Credit Suisse Loan Agreement required the borrower to maintain solvency and the Yellowstone Club did so up

---

[2] In fact, Mr. Blixseth continued to discuss these matters with Mr. Brown, as his attorney, right up to and including Saturday, April 11, 2009.

through August 2008, when Edra Blixseth took control of the Club pursuant to the terms of the MSA, negotiated in part by Mr. Blixseth's personal lawyer, Defendant Brown.

27.     The use of Credit Suisse Transaction loan proceeds for non-Club purposes was, according to advice from Mr. Brown, legal and proper, and Mr. Blixseth expressly relied upon that advice in entering into the Credit Suisse Transaction. A portion of the Loan Proceeds was used as part of the master plan to make the Club into an international club with locations in various parts of the world. Plaintiff repeatedly discussed with Mr. Brown that $209,000,000 of the Credit Suisse loan proceeds would be borrowed by BGI, consistent with the provisions of the Credit Suisse Transaction and which use was approved by Mr. Brown.

28.     In fact, Mr. Brown vigorously defended Plaintiff's right to finance his international plans for the Yellowstone Club with funds from the loan proceeds.

29.     The Yellowstone Club also specifically retained from the legal services of Mr. Brown and Garlington to advise and assist the Yellowstone Club on the Credit Suisse Transaction, while he was acting both as the Yellowstone Club's lawyer and as Mr. Blixseth's own lawyer. Mr. Brown's Opinion Letter dated September 30, 2005, states that the Yellowstone Club was authorized to and

-14-

was not in violation of any laws, in entering into the Credit Suisse Transaction.

Both the Yellowstone Club and Mr. Blixseth relied on Mr. Brown's advice leading

up to and including his issuance of the Opinion Letter in entering into the Credit

Suisse Transaction, which stated on the very first page of the Credit Suisse Loan

Agreement that the Yellowstone Club would use up to $209,000,000 for

distributions or loans to members for purposes unrelated to development of the

Yellowstone Club and for investments up to $142,000,000 into unrestricted

subsidiaries for purposes unrelated to the Yellowstone Club.

30.     Despite being the attorneys for both Mr. Blixseth and the Yellowstone

Club during the Credit Suisse Transaction, Mr. Brown and Garlington never

informed Mr. Blixseth of the inherent conflict of interest associated with their dual

representation and never obtained Mr. Blixseth's informed consent in writing to

move forward with their involvement in the Credit Suisse Transaction.

31.     The Club and Mr. Blixseth relied upon this Opinion Letter and

Brown's other advice to consummate the Credit Suisse Transaction and use the

loan proceeds as set out in the Credit Suisse Loan Agreement.  Plaintiff relied upon

his numerous confidential attorney-client communications with Mr. Brown and

Garlington that the use of these proceeds was proper and legitimate, right up until

Saturday, April 11, 2009, when Mr. Blixseth had several conversations with Mr. Brown following his deposition.

32.    At no time did Brown or the Garlington firm advise Mr. Blixseth that the use of the Credit Suisse loan proceeds could be attacked as a fraudulent transfer or as a breach of Mr. Blixseth's fiduciary duties, or as a wrongful distribution.

33.    Mr. Brown or Garlington never advised Mr. Blixseth that the Credit Suisse Transaction was based on violations of various federal and state laws including FIRREA and USPAP, notwithstanding the representations in the Opinion Letter, and this defect that remained undiscovered until after Yellowstone Bankruptcy commenced.

34.    Subsequent to the Yellowstone Club entering into the Credit Suisse Transaction, Mr. Brown continued representing the Yellowstone Club and Mr. Blixseth individually, handling employment and construction matters and litigation for the Yellowstone Club up until September 2008. Although Mr. Brown testified in his deposition that he stopped representing Mr. Blixseth on November 8, 2008, he continued to represent Mr. Blixseth through at least April 2009. Pursuant to that representation, Mr. Blixseth shared in excess of 20 confidential communications with him since November 8, 2008 while he acted as Mr. Blixseth's individual attorney.

35.     Mr. Brown and the Garlington firm have represented Mr. Blixseth individually in numerous matters before and subsequent to the Credit Suisse Transaction right up to at least April 2009.

36.     Specifically, Mr. Brown has had an attorney-client relationship with Mr. Blixseth as an individual, or as an officer of one of the Yellowstone Club entities in numerous matters from 1999 to at least April of 2009.  Through the course of that representation, Mr. Blixseth has shared hundreds, if not thousands, of confidential communications with him on numerous matters, including virtually all aspects of the Credit Suisse Transaction, and specifically including how the Loan Proceeds have been used.  He used the information gleaned from Mr. Blixseth's confidential communications in the defense of the *LeMond* case; and he assured Mr. Blixseth that the Yellowstone Club, BGI, and subsequently Mr. Blixseth, were legitimately and absolutely entitled to use the Loan Proceeds as used.  Further, during his representation of Mr. Blixseth, Brown and the Garlington firm learned of numerous facts and circumstances relating to Mr. Blixseth and his business dealings and transactions which were not necessarily embodied in attorney-client privileged communications.

## LeMond Litigation

37.    Beginning in May 2006, Mr. Brown and Garlington represented and advised Mr. Blixseth, BGI and the Yellowstone Club in connection with the *LeMond* Litigation (*Greg LeMond et al. v. Blixseth Group, Inc., et al.*, Civil No. DV 29-06-26, Montana Fifth Judicial District Court, Madison County, Montana) and later entered an appearance as counsel in the summer of 2007.

38.    Mr. Brown and Garlington had full knowledge of the litigation issues involving the $209,000,000 payout to BGI as early as March 2006. One of *LeMond's* main claims was that the BGI Loan was not authorized by the Yellowstone Club Operating Agreement, and that it was a breach of Mr. Blixseth's fiduciary duty to Yellowstone Club to proceed with the BGI Loan, which *LeMond* claimed was a distribution. During the course of the *LeMond* litigation, Brown continued to opine that the BGI Loan was allowable under the Yellowstone Club Operating Agreement and was not a wrongful distribution.

39.    Brown and Garlington never advised Mr. Blixseth of their conflict of interest inherent in representing Mr. Blixseth personally and the defendant entities in connection with claims against them in the *LeMond* litigation.

40.    Despite the *LeMond* claims being derivative in nature, which would deprive *LeMond's* standing to sue Mr. Blixseth for individual alleged damages,

Mr. Brown failed to advise Mr. Blixseth of this fact.  Lacking information about

this material and substantial defense, Mr. Blixseth settled the *LeMond* litigation

upon advice of Brown at a far higher amount then he would have had he been

aware of this key defense.  That Mr. Blixseth settled with *LeMond* in the amount

that he did, then encouraged and perpetuated additional claims against him by the

"B" shareholders, which litigation claims were assigned to the Yellowstone Club

Liquidating Trust ("YCLT") to prosecute against Mr. Blixseth in Adversary Case

No. 09-18 and which claims also supported a $22 million claim against the

Yellowstone Club which the YCLT is seeking to enforce against Mr. Blixseth in

addition to its claims against him in AP-18.  In other words, the settlement for

which Brown represented Mr. Blixseth in the *LeMond* litigation has caused other

parties to see over $22 million from Mr. Blixseth based on the same facts for

which Mr. Blixseth settled with *LeMond*.

### Blixseth Divorce

41.     Mr. Brown also represented Mr. Blixseth in connection with the

settlement of Mr. Blixseth's marital dispute with his now ex-wife, Edra Blixseth.

42.     Mr. Brown and Garlington had an integral part in Mr. Blixseth's

divorce and was deeply involved through the divorce proceeding, including but not

limited to drafting pleadings, motions to compel discovery and reviewing

discovery for responsive documents; traveling to San Francisco for a two-day mediation on behalf of Mr. Blixseth; providing extensive legal services related to the drafting and closing of the MSA.

43.     Mr. Brown was instrumental in getting general releases for Mr. Blixseth from not only Edra Blixseth, but all of the Yellowstone entities and BGI, which was transferred to Edra Blixseth as part of the settlement negotiated by Mr. Brown and included in Mr. Blixseth's MSA.  Those releases negotiated by Mr. Brown expressly and wrongfully released claims for breach of fiduciary duty - claims on which the UCC, led by Mr. Brown, then sued Mr. Blixseth, his client.

44.     At no time through April 2009 did Mr. Brown and Garlington ever advise Mr. Blixseth concerning the risks associated with the waivers and releases that were a material component of the MSA.  Needless to say, Brown and Garlington never advised Mr. Blixseth that the MSA waivers and releases could be subsequently attacked and set aside as fraudulent transfers.  Had Brown and Garlington so informed Mr. Blixseth, Mr. Blixseth would not have consummated the MSA which gave control of BGI and the Yellowstone Club to Edra Blixseth, which then resulted in the parade of horribles that Mr. Blixseth faced and continues to face as a result of the Yellowstone Club bankruptcy.

45.     Moreover, at no time through April 2009 did Mr. Brown and Garlington ever disclose to Mr. Blixseth that there was any question about the propriety of the use of the proceeds of the Credit Suisse Transaction, the validity of releases Mr. Brown obtained as part of the MSA and/or the accuracy of Mr. Brown's and Garlington's legal advice to Mr. Blixseth.

46.     Mr. Brown was so involved in the divorce proceedings that he took liberties to communicate with Edra Blixseth and inform her that he could "control" Mr. Blixseth to arrive at a divorce settlement that favored Edra Blixseth.  Mr. Brown's communications were unknown to and not authorized by Mr. Blixseth.

47.     Although the final judgment of divorce was entered on October 7, 2008, from November 2008 through January 20, 2009, Mr. Brown continued to represent Mr. Blixseth regarding how to best pursue the enforcement of the MSA, since Edra Blixseth breached the MSA shortly after its closing.

### Yellowstone Club Bankruptcy

48.     In November of 2008, the Yellowstone Mountain Club, LLC filed for Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Montana.

49.     Prior to filing of the petition in the Yellowstone Club Bankruptcy, Mr. Brown and Garlington represented Mr. Blixseth related to the possibility of the

Yellowstone Club filing for Chapter 11 protection and represented Mr. Blixseth in the early stages of the bankruptcy case, including but not limited to, reviewing and advising Mr. Blixseth regarding the Yellowstone Club's bankruptcy filings, appearing for Mr. Blixseth at an initial hearing in the Yellowstone Bankruptcy case for Mr. Blixseth, assuring Mr. Blixseth that Mr. Brown would go in person to the hearing on November 12, 2008, updating Mr. Blixseth regarding Credit Suisse being noticed for depositions, and being a part of Mr. Blixseth's legal team in discussions about defamatory statements on a blog against Mr. Blixseth pertaining to the Yellowstone Club bankruptcy and the potential of Yellowstone Club World being a part of the Chapter 11 bankruptcy matter.

50.     Despite Mr. Brown's representation of Mr. Blixseth in the Yellowstone Club bankruptcy and without first obtaining written informed consent from Mr. Blixseth, Mr. Brown applied for and was appointed Chairman of the UCC.  Unbeknownst to Mr. Blixseth, at this time Mr. Brown was actually lobbying for a position on the UCC based on all his knowledge he had learned while representing Mr. Blixseth.

51.     At that time, Mr. Brown advised Mr. Blixseth that he would protect and defend his interest as chairman of the UCC even though the UCC was in fact examining a potential lawsuit against Mr. Blixseth, which it ultimately filed in the

United States Bankruptcy Court for the District of Montana, Adversary Proceeding No. 09-0014 ("AP 14").

52.     Mr. Brown served as chairman of the UCC even when, by his own admission, he continued to represent Mr. Blixseth on matters directly related to the Yellowstone Club bankruptcy after the petitions were filed on November 8, 2008. And, Mr. Brown advocated for a seat on the UCC, so that he could control and prevent the Yellowstone Club debtors from bringing legal malpractice claims against Mr. Brown and Garlington for their prior representations of the debtors, even though such a position would place Mr. Brown directly adverse to Mr. Blixseth; thus, creating an unwaiverable conflict.

53.     For instance, as discussed above, Mr. Brown wrote the September 30, 2005 Opinion Letter approving the Credit Suisse loan, including the payout to BGI, wherein Mr. Brown and Garlington affirmed that it was their opinion that the loan transaction as structured was not a breach of fiduciary duty by Mr. Blixseth. Yet, as chairman of the UCC, Mr. Brown assisted the UCC in attempting to evade the very legal opinion he authored, and then was substantially involved himself in the UCC's lawsuit against Mr. Blixseth to evade that very legal opinion and fabricate facts that would implicate Mr. Blixseth while exculpating Brown and his firm for their prior malpractice to both Mr. Blixseth and the Yellowstone Club.

54.     Shocking as it is that Mr. Brown led the charge by the UCC against his client based on the theory that the legal opinion letter that Mr. Brown wrote *for Mr. Blixseth* was false, Mr. Brown's and Garlington's conflicts are much more extensive.  As discussed above, Mr. Brown and Garlington represented Mr. Blixseth, BGI and the Yellowstone Club in the *LeMond* litigation, and had full knowledge of the litigation issues involving the $209,000,000 payout to BGI, and during the course of *LeMond* litigation, Brown continued to opine that the BGI Loan was allowable under the Yellowstone Club Operating Agreement.  Yet, when the UCC sued Mr. Blixseth, Brown was instrumental in the UCC and the Debtors alleging the exact opposite.

55.     Mr. Brown also represented Mr. Blixseth in connection with the settlement of Mr. Blixseth's marital dispute with his now ex-wife, Edra Blixseth, and was instrumental in getting general releases for Mr. Blixseth from not only Edra Blixseth, but all of the Yellowstone entities and BGI, which was transferred to Edra Blixseth as part of the settlement negotiated by Mr. Brown and included in Mr. Blixseth's MSA.  Those releases negotiated by Mr. Brown expressly released claims for breach of fiduciary duty - claims on which the UCC, led by Mr. Brown, then sued his client.  Compounding the overt, actual and unwaivable conflict and breach of fiduciary duties, Mr. Brown and the UCC contended that the releases

within the MSA *that Mr. Brown negotiated, edited, approved for Plaintiff and advised Plaintiff to execute* were unenforceable.

56.     Although the UCC action against Plaintiff was allegedly being discussed in early February, 2009, Mr. Brown billed Mr. Blixseth almost $90,000 for his work on the MSA for December 2008, a mere two months earlier and Brown continued to represent Mr. Blixseth in the *Lemond II (Lemond Group, Inc.,* Cause No. DV-29-2007-5, Montana Fifth Judicial District Court) litigation up until April of 2009.  Mr. Brown's representation of Mr. Blixseth was extensive; Mr. Brown and his firm worked closely with Plaintiff and billed over 300 hours on the MSA issues alone.  He represented Mr. Blixseth in mediation with Edra Blixseth where the releases relating to, among other things, the Yellowstone entities and BGI were hammered out.

57.     In fact, according to the privilege log produced in connection with AP-14, Mr. Brown had a plethora of email communications with the UCC. Although the UCC contends that Mr. Brown was not serving as a lawyer on the UCC, the privilege log contends that Mr. Brown's communications with the UCC were attorney-client privilege and could be concealed from Mr. Blixseth even though these supposedly privileged communications contemplated litigation against Mr. Blixseth!

58.     An article published on January 13, 2009 by the Billings Gazette even

discussed Mr. Brown's dual role as Mr. Blixseth's attorney and as the chairman of

the UCC, in the following excerpt:

> "Tim Blixseth referred questions about the $271 million in loans to
> his attorney, Stephen Brown.
>
> Brown said the loans - secured only by a series of two-page
> 'promissory notes' and with no collateral to back them up - were no
> longer Tim Blixseth's responsibility. As 'corporate notes', he said the
> promissory notes remained the obligation of BGI.
>
> 'He's not involved in the hearing because he's not involved in the
> bankruptcy.' Brown said. 'BGI was a company that went to her
> (Edra) in the divorce. He has no ownership of BGI anymore.'
>
> Complicating the case is Brown's dual role as chairman of the 11-
> person Unsecured Creditors Committee. That's the court-approved
> entity charged with looking after the interests of the hundreds of
> companies and individuals owed money by the Yellowstone Club."

59.     Andy Patten, one of the Debtor entities' (i.e., the Yellowstone Club)

bankruptcy attorneys, summed the issue best on behalf of the UCC when he wrote

in an email to Mr. Brown and Mr. Thomas Beckett on January 16, 2009:

> Moreover, if, as it appears, Steve was involved in the Credit Suisse
> loan and the subsequent transactions, Steve has a conflict of interest.
> Will he now be using knowledge he gained as attorney for YMC, YD
> BGI, Tim or Edra? He's the chairman of the entity suing BGI, and we
> all suspect there will be claims leading to Tim and Edra. This seems
> to be a huge problem to me. I can look up the rule of professional
> conduct if you want me to, but I recall that it violates the rules if an

attorney uses information gained while representing someone against that someone later.

60.     Ironically, Mr. Brown's responding January 16, 2009 email to Mr. Patten is perhaps the clearest indication of Mr. Brown's knowledge of his own conflicts, where he attempts to minimize his work for Mr. Blixseth, and argues that he should remain on the UCC, "… because there are many facts that I know better than almost everyone else about the intricacies of the various agreements that have been struck over the years," i.e., information he gained from Mr. Blixseth while serving as Mr. Blixseth's attorney.

61.     Mr. Blixseth's rights as the client of Mr. Brown and Garlington, and his confidentiality have forever been tainted by Mr. Brown's and Garlington's directly adverse position to Plaintiff on the precise matters over which Mr. Brown and Garlington represented Mr. Blixseth.  It is clear that numerous other lawyers representing adverse interests to Mr. Blixseth in connection with the Yellowstone Club's bankruptcy have directly communicated with Mr. Brown since at least the time that the Yellowstone Club bankruptcy was filed in November 2008; and that based on his testimony in AP-14, Mr. Brown gave testimony against Mr. Blixseth's interests, based on what Brown had learned during his representation of Mr. Blixseth, contrary to the truth, contrary to Brown's prior advice to Mr. Blixseth,

-27-

contrary to Mr. Blixseth's communications with Mr. Brown as recently as April 11, 2009, and contrary to his actions and discussions with Mr. Blixseth since 2005.

62.     Despite his clear motives against Mr. Blixseth, on Friday, April 10, 2009, following his deposition, Mr. Brown called Mr. Blixseth on Mr. Blixseth's cell phone but did not leave a message. Mr. Blixseth returned his call the next day to his office. When Mr. Blixseth spoke with Mr. Brown on Saturday morning, April 11, 2009, Mr. Brown continued to assert that his prior legal advice concerning the propriety of the Credit Suisse Transaction was correct.

63.     Nevertheless, during the discovery responses related to AP-14, Mr. Brown gave false discovery responses and testimony concerning the extent of his representation of Mr. Blixseth and his role in representing Mr. Blixseth in the Credit Suisse Transaction, in particular his knowledge about the use of the loan proceeds. Brown did this to both shield him and his firm from liability to the Yellowstone Club for their advice of the Club concerning the Credit Suisse Transaction, while at the same time placing all the blame on Mr. Blixseth for the Club's financial demise, which blame would ultimately lead to a judgment against Mr. Blixseth, which judgment would satisfy the claim for unpaid legal fees that Brown and Garlington had against the Yellowstone Club.

64.     Ultimately, the UCC went to trial against Mr. Blixseth in AP-14, using all of the information that it had gleaned from Mr. Brown's representation of Plaintiff in connection with the Credit Suisse Transaction, and in connection with Plaintiff's divorce, seeking over $286,000,000 from Mr. Blixseth for allegedly improper use of the Credit Suisse Transaction funds - the precise use that Mr. Brown repeatedly approved to Mr. Blixseth and had defended in the *Lemond* litigation time and time again.

65.     During the trial of AP-14, Mr. Brown recanted, through testimony, his prior advice concerning the legitimacy of the Yellowstone Club and BGI's use of the loan proceeds.  Despite years of legal advice that the Credit Suisse Transaction and the Yellowstone Club's and BGI's use of the loan proceeds were legitimate, Mr. Brown, in order to protect his law firm from liability, turned on his longtime client and lied about the advice he had given.

66.     Ultimately, the bankruptcy court ruled against Mr. Blixseth in AP-14 concerning the validity of the loans made between the Yellowstone Club and BGI, and further held that the broad release contained in the MSA did not release Mr. Blixseth from liability.  The UCC, led by Mr. Brown, obtained personal liability against Mr. Blixseth for the poor legal advice provided by Mr. Brown and his firm prior to the Yellowstone Club ever filing a petition for bankruptcy protection.

## Third Amended Plan of Reorganization

67.     After the AP-14 trial, the Yellowstone Club assembled its Third

Amended Plan of Reorganization, that Brown and Garlington not only agreed to,

but actively solicited approval of.

68.     The Third Amended Plan allowed Mr. Brown and Garlington to not

only recover unpaid legal fees owed to them by the Yellowstone Club, but also

created a liquidating trust that made Mr. Blixseth the sole litigation target to satisfy

the claims of the Yellowstone Club's unsecured creditors.  This litigation targeted

Mr. Blixseth for liability arising from the very same transaction in which Brown

and Garlington represented and advised Mr. Blixseth.  Moreover, the Third

Amended Plan contained broad exculpation clauses that purported to exculpate Mr.

Brown and Garlington from liability to Mr. Blixseth for actions they took during

the Yellowstone Club bankruptcy in contravention of their fiduciary duties to Mr.

Blixseth as set forth herein.  Further, the Third Amended Plan contemplated Brown

and his firm escaping all liability for their pre-petition malpractice to the

Yellowstone Club in connection with the very same transactions in which they

represented Mr. Blixseth and for which the YCLT was pursuing a $280+ million

judgment against Mr. Blixseth.

69.     Part of the motivation for Mr. Brown agreeing to this Plan was based on Mr. Brown's and Garlington's desire to be paid from the Yellowstone Club for outstanding legal bills owed to the Garlington firm by the Yellowstone Club, not by Mr. Blixseth.

70.     Mr. Brown and Garlington breached their fiduciary duties owed to Mr. Blixseth for their own pecuniary gain, i.e., collecting on legal bills owed by another client.

71.     Mr. Brown and Garlington also had a gross conflict of interest in Mr. Brown approving the settlement because they were motivated to exculpate themselves for their legal malpractice that they committed against the Yellowstone Club for approving the Credit Suisse Transaction and the MSA waivers and releases because it was these two transactions that the Yellowstone Club debtor entities and the UCC were alleging to have been unlawful and the cause of the Club's financial demise.

72.     Mr. Brown and Garlington allowed and preferred their own interests in avoiding liability to the Yellowstone Club and UCC to conflict with their duties to Mr. Blixseth and as a result agreed to a plan of reorganization which exculpated them from liability while at the same time targeted Mr. Blixseth for hundreds of

millions in liability based on the very same conduct that Mr. Brown and Garlington had previously represented both Mr. Blixseth and the Yellowstone Club.

73.     Not only did Mr. Brown agree to the approval of the Third Amended Plan of Reorganization, but Mr. Brown also solicited others to approve the plan, which made his longtime client, the sole litigation target for years to come.

## FIRST CAUSE OF ACTION

### (Legal Malpractice Against Mr. Brown and Garlington)

74.     Mr. Blixseth hereby incorporates the preceding allegations herein as though expressly set out here in full.

75.     As Mr. Blixseth's attorneys, Mr. Brown and Garlington owed a duty to Mr. Blixseth to exercise reasonable care, skill, prudence and diligence on behalf of Mr. Blixseth and to exercise due care to protect Mr. Blixseth's best interests in all matters and transactions in which they represented Mr. Blixseth.

76.     By the acts set forth above, Mr. Brown and Garlington each carelessly and negligently breached their duties which each owed to Mr. Blixseth, including but not limited to:

(a)     Advising Mr. Blixseth and authoring an Opinion Letter stating that the Credit Suisse Transaction did not violate any laws when the transaction in fact violated both federal and state lending and appraisal laws, including FIRREA and USPAP;

(b)     Advising Mr. Blixseth and authoring an Opinion Letter
        authorizing the explicit use of the loan proceeds of the Credit
        Suisse Transaction as not violating any laws, including Mr.
        Blixseth's fiduciary duties, and then contending in direct
        conflict therewith that the use of such proceeds violated
        Montana laws and breached Mr. Blixseth's fiduciary duties to
        the Yellowstone Club;

(c)     Failing to advise Mr. Blixseth in the *LeMond* litigation that a
        substantial defense existed that the claims set forth in the
        Second Amended Complaint were derivative in nature, and that
        the *LeMond* plaintiffs had no standing to sue;

(d)     Negotiating, reviewing, editing and approving and advising Mr.
        Blixseth to execute general releases for Mr. Blixseth in Mr.
        Blixseth's MSA that waived any claims arising out of the
        Credit Suisse Transaction while subsequently participating in a
        lawsuit (AP-14) contending the exact opposite, as set forth
        above;

(e)     Negotiating, reviewing, editing and approving and advising Mr.
        Blixseth to execute general releases for Mr. Blixseth in Mr.
        Blixseth's MSA that waived any claims arising out of the
        Credit Suisse Transaction which were later found by the U.S.
        Bankruptcy Court for the District of Montana to be
        unenforceable as to Yellowstone Club, yet were a material part
        of the MSA;

(f)     Negotiating, reviewing, editing and approving and advising Mr.
        Blixseth to execute general releases for Mr. Blixseth in Mr.
        Blixseth's MSA that waived any claims arising out of the
        Credit Suisse Transaction without advising Mr. Blixseth of the
        risk that the releases could potentially be set aside by the Club
        and/or the Club's creditors.

(g)     By failing to advise Mr. Blixseth prior to the Yellowstone Club
        bankruptcy case and specifically during the Credit Suisse

Transaction, the *LeMond* litigation and the MSA with respect to the identify of their client as required by Montana Rule of Professional Conduct 1.13(d);

(h) By inducing Mr. Blixseth to rely on Mr. Brown's and Garlington's legal advice, given both orally and in writing, that the proposed use of the Credit Suisse Transaction loan proceeds was legal and in compliance with all laws. In the trial of AP-14 Mr. Brown subsequently reneged on his prior advice that the Credit Suisse Transaction complied with all laws, and as a result, the U.S. Bankruptcy Court for the District of Montana found that Mr. Blixseth breached his fiduciary duties to the Club as a result of the Transaction;

(i) By breaching Montana Rules of Professional Responsibility 1.7 by serving on the UCC in a direct, actual and unwaiverable conflict of interest with his client concerning matters on which Mr. Brown and Garlington had represented Mr. Blixseth;

(j) By breaching Montana Rule of Professional Responsibility 1.7(b) by concurrently representing Mr. Blixseth personally and the Yellowstone Club entities in a corporate capacity during the MSA negotiations and litigation and specifically negotiating, reviewing, editing and approving the waivers and releases on behalf of Club entitles and in favor of Mr. Blixseth without informing either of the potential conflict of interest and without obtaining their informed consent in writing to continue his representation of both.

(k) By failing and refusing to withdraw from the UCC when any reasonable attorney would have withdrawn in such circumstances;

(l) By disclosing attorney-client communications to the UCC and failing to disclose these communications to Mr. Blixseth in violation of Montana Rule of Professional Conduct 1.6;

(m)     By serving as Chairmen of the UCC and using information that Mr. Brown and Garlington had learned during their representation of Mr. Blixseth to the detriment of Mr. Blixseth in violation of Montana Rule of Professional Conduct 1.8(b);

(n)     By exposing Mr. Blixseth to significant claims that can only be the result of Mr. Brown's and Garlington's improper legal advice as Mr. Blixseth's legal counsel;

(o)     By failing to properly represent Mr. Blixseth in connection with the MSA such that the releases that Mr. Brown negotiated for Mr. Blixseth could potentially be set aside as a fraudulent conveyance, without disclosing any such risks or possibilities to Mr. Blixseth, and instead, inducing Mr. Blixseth to rely on Mr. Brown's legal advice to enter into a full and final agreement regarding MSA that he would have never entered into without such advice;

(p)     By exposing Mr. Blixseth to liabilities in excess of $286,000,000 as a result of Brown and Garlington's conflict of interest and negligent advice relative to the Credit Suisse Transaction and MSA;

(q)     By taking positions directly contrary to the interests of Mr. Brown's and Garlington's client regarding matters on which they had represented Mr. Blixseth;

(r)     By encouraging and soliciting unsecured creditors in the Yellowstone Club bankruptcy to vote in favor of the Chapter 11 plan that advocated and was based upon litigation against Mr. Brown's and Garlington's client, Mr. Blixseth, for the very Credit Suisse Loan Transaction that they had approved on behalf of their clients;

(s)     By participating in the negotiations for the settlement term sheet in the Yellowstone Club bankruptcy and signing the term sheet on behalf of the UCC, which not only led to the

confirmation of the Chapter 11 Plan, the success of which was based almost exclusively on successful litigation against Mr. Blixseth in AP-14. The underlying premise of the Third Amended Plan was to fund the Plan and get Club creditors paid, including Garlington, through litigation against Mr. Blixseth;

(t)   By continuing to represent Mr. Blixseth through at least April 2009, the direct negligence of Mr. Brown and Garlington continued from September, 2005 to at least April 2009.

77.   As a proximate result of Mr. Brown's and Garlington's numerous breaches of the requisite standard of care, Mr. Blixseth has suffered and continues to suffer damages in an amount to be determined by this Court but in excess of $375,000,000.

78.   Mr. Brown and Garlington, in doing the acts alleged herein, acted in conscious disregard of the known risks that their negligent conduct posed to Mr. Blixseth, and Mr. Blixseth is therefore entitled to punitive damages.

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty Against Mr. Brown and Garlington)

79.   Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as though restated herein.

80.   Mr. Brown and Garlington owed fiduciary duties of utmost trust, good faith and loyalty to Mr. Blixseth.

81.     By the acts alleged herein, Mr. Brown and Garlington and each of them breached their fiduciary duties owed to Mr. Blixseth.

82.     In doing the acts alleged herein, Mr. Brown and Garlington acted willfully, maliciously, intentionally or in the alternative, recklessly and in conscious disregard of the known risks to Mr. Blixseth presented by their willful suppression of the facts indicating their negligence and Mr. Blixseth is therefore entitled to punitive damages.

83.     Most notably, despite having written an opinion of counsel letter in 2005 affirming the validity of the Credit Suisse loan and affirming that it was fully compliant with all laws, upon which Mr. Blixseth relied, in AP-14 Mr. Brown subsequently reneged on his opinion that the Credit Suisse loan and use of the proceeds was compliant with all laws and as a result, Mr. Blixseth was found by the U.S. Bankruptcy Court for the District of Montana to have breached his fiduciary duties to the Club.

84.     Mr. Brown reneged on his previous legal opinion to the Club and to Mr. Blixseth for the purpose of helping the Yellowstone Club debtor entities and the UCC succeed in their litigation against Mr. Blixseth in AP-14.  In doing so, Mr. Brown and Garlington breached their fiduciary duties to Mr. Blixseth and the Yellowstone Club as their attorneys.

85.     Mr. Brown further breached his fiduciary duties to Mr. Blixseth by giving knowingly false testimony and discovery responses in AP-14 concerning his prior role in representing Mr. Blixseth and the Yellowstone Club and his knowledge concerning the use of the Credit Suisse loan proceeds. Brown gave this knowingly false testimony to protect him and his own firm from liability to the Debtors while at the same time implicating Mr. Blixseth in wrongdoing.

86.     Mr. Brown further breached his fiduciary duties to Mr. Blixseth recanting in testimony and in discovery responses in AP-14 and the Yellowstone Club main bankruptcy case his prior advice to Mr. Blixseth concerning the legitimacy of the Credit Suisse loan proceeds. Brown did this for the purpose of protecting himself and his own firm from liability to the Debtors while at the same time implicating Mr. Blixseth in wrongdoing, which would further the Debtors' plan of reorganization so that Brown and his firm could be repaid on unpaid legal fees owed to them by the Debtors.

87.     Mr. Brown further breached his fiduciary duties owed to Mr. Blixseth by soliciting approval of the Third Amended Plan of Reorganization which made Mr. Blixseth the primary (if not only) litigation target of the Debtors, but included an exculpation clause that exculpated Brown and his firm from liability to the Debtors for their own liability to the Debtors for their representation of the Debtors

-38-

in connection with the very same transaction for which the Debtors were suing Mr. Blixseth.

88.     Mr. Brown further breached his fiduciary duties owed to Mr. Blixseth by soliciting approval of the Third Amended Plan of Reorganization which made Mr. Blixseth the primary (if not only) litigation target of the Debtors, but included an exculpation clause that exculpated Brown and his firm from liability to Mr. Blixseth for their own liability to him for their representation of him in connection with the very same transaction for which the Debtors were suing Mr. Blixseth.

89.     Mr. Brown further breached his fiduciary duties owed to Mr. Blixseth by acting as Chairman of the UCC and in that capacity and for the purpose of using information he had gained during the course of his representation of Mr. Blixseth to Mr. Blixseth's detriment.

90.     Mr. Brown further breached his fiduciary duties owed to Mr. Blixseth by advocating for a seat on the unsecured creditors committee so that Brown and his firm could control and prevent the Debtors from bringing legal malpractice claims against them for their prior representation of the Debtors even though such a position put them in a direct conflict of interest with Mr. Blixseth.

91.     Mr. Brown further breached his fiduciary duties to Mr. Blixseth by failing to obtain Mr. Blixseth's informed consent in writing prior to accepting a

seat on the unsecured creditors committee given the obvious conflict of interest inherent in Brown sitting on the UCC. Moreover, he also breached his fiduciary duties to Mr. Blixseth by advising Mr. Blixseth that he would protect and defend Mr. Blixseth in his role as chairman of the UCC when in fact he did the opposite.

92.    Mr. Brown further breached his fiduciary duties owed to Mr. Blixseth by acting as Chairman of the UCC and in that capacity reneging on the validity of the MSA waivers and releases to that the UCC could prevail against Mr. Blixseth in AP-14.

93.    Mr. Brown further breached his fiduciary duties to Mr. Blixseth because when he served as Chairman of the UCC, he actively encouraged and solicited unsecured creditors in the Yellowstone Club bankruptcy to vote in favor of the Chapter 11 plan which advocated and was based upon litigation against his client, Mr. Blixseth, for the very Credit Suisse loan transactions that he had approved on behalf of his client. As chairman of the UCC he participated in the negotiations for the settlement term sheet in the Yellowstone Club bankruptcy and signed the term sheet on behalf of the UCC, which not only led to the confirmation of the Chapter 11 plan that was focused on litigation against Mr. Blixseth but also left Mr. Blixseth as the target of AP-14 and numerous other pieces of litigation in

order to fund the Chapter 11 plan, including payments under the plan to Credit Suisse and to Garlington.

94.     Mr. Brown further breached his fiduciary duties to Mr. Blixseth in connection with the MSA by having discussions with Edra Blixseth concerning the MSA without Mr. Blixseth's knowledge or consent.

95.     Mr. Brown further breached his fiduciary duties to Mr. Blixseth by meeting with counsel for the Debtors, Tom Hutchinson, without Mr. Blixseth's knowledge or consent for the purpose of Brown disclosing information he learned during his prior representation of Mr. Blixseth and also misrepresenting his prior knowledge of the use of the Credit Suisse loan proceeds and advise to Mr. Blixseth and the Debtors regarding the same. All for the purpose of manufacturing evidence in AP-14 that would eliminate Mr. Blixseth's defenses therein and to eliminate Brown's own liability to the Debtors arising from his prior representation of the Yellowstone Club.

96.     Mr. Brown further breached his fiduciary duties to Mr. Blixseth by misrepresenting to third parties his prior role as counsel for Mr. Blixseth and the Yellowstone Club so as to retain his seat on the UCC in the face of questions from the media and Andy Patten concerning his obvious conflict of interest. Brown did this to further his and his firm's own interest in eliminating their liability to the

Debtors and crafting a plan of reorganization that would satisfy their claim against the Debtors for unpaid attorneys' fees.

97.     As a proximate result of Mr. Brown's and Garlington's numerous breaches of their fiduciary duties to Mr. Blixseth, Mr. Blixseth has suffered and continues to suffer damages in an amount to be determined by this Court but in excess of $375,000,000.  Further, the breach of fiduciary duties to Mr. Blixseth was wanton and willful and justifies the imposition of punitive and exemplary damages against Brown and Garlington.

## THIRD CAUSE OF ACTION

### (Breach of Contract Against Mr. Brown and Garlington)

98.     Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as though restated herein.

99.     Mr. Blixseth entered into an agreement with Mr. Brown and Garlington.

100.    Under the terms of that agreement, Mr. Brown and Garlington were obligated to perform their duties under the contract with the requisite level of skill of attorneys similarly employed in the State of Montana.

101.   Pursuant to the term of the contract, Mr. Brown and Garlington were paid hundreds of thousands of dollars in legal fees, and Mr. Blixseth has fully performed all of his obligations pursuant to the contract.

102.   By the acts herein alleged, Mr. Brown and Garlington breached the contract.

103.   As a proximate result of Mr. Brown's and Garlington's breach, Mr. Blixseth has suffered and continues to suffer damages in an amount to be determined by this Court but in excess of $375,000,000.

## FOURTH CAUSE OF ACTION

### (Fraud Against Mr. Brown and Garlington)

104.   Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as though restated herein.

105.   Mr. Brown and Garlington intentionally misrepresented, or in the alternative, suppressed numerous material facts, including but not limited to the following:

(a)   Representing that the proposed use of the Credit Suisse Transaction loan proceeds did not violate any Montana laws, when these Mr. Brown later contended the precise opposite as set forth above;

(b)     Representing to Mr. Blixseth that they would properly protect his interests and would uphold their fiduciary duties of loyalty and confidentiality;

(c)     Falsely stating under oath that as counsel for the Yellowstone Club, he was not aware of the use of the Credit Suisse loan proceeds, that the use of such proceeds were "hidden" from him for "several years" when in fact he approved the Credit Suisse Transaction Credit Agreement which provided for such loan in 2005 and knew the specific use of the funds as early as May 2006;

(d)     Suppressing the fact that Mr. Brown disclosed and was likely to have disclosed confidential and attorney-client privileged information to the UCC and others as set forth above;

(e)     Suppressing the fact that they had a conflict of interest while assuring Mr. Blixseth that there was no conflict of interest;

(f)     Suppressing the fact that their legal advice was either correct, in which case all claims of AP-14 must be dismissed, or that the advice was incorrect and subjected Mr. Blixseth to liability as a result;

(g)     Suppressing the fact that the Releases negotiated for Mr. Blixseth in the MSA would not necessarily be enforceable;

(h)     Advising Mr. Blixseth that Brown sitting as Chairman of the UCC would be beneficial to Mr. Blixseth because in that position Brown could protect Mr. Blixseth. When in fact, and unbeknownst to Mr. Blixseth, Brown sought to serve on the UCC to serve the interests of himself and his firm as set forth above, and further those interests by breaching his fiduciary duties to Mr. Blixseth. Mr. Blixseth relied in Mr. Brown's material representation to him to his detriment because with the cover of Mr. Blixseth's supposed blessing to sit on the UCC, Brown then breached his duties to Mr. Blixseth as described

herein and the bankruptcy court also used Mr. Blixseth's
supposed encouragement to have Brown sit on the UCC to
rebuff later efforts of Mr. Blixseth to dismiss AP-14 based on
the taint that Brown's breach of fiduciary duties had on the
case.

106.   Each of the misrepresentations were false when made, and Mr. Brown

and Garlington were aware of their falsity when made.

107.   Mr. Brown and Garlington made the representations and suppressed

facts in order to induce Mr. Blixseth to rely on those misrepresentations and

omissions.

108.   Mr. Blixseth justifiably relied on those misrepresentations and

omissions by not terminating Mr. Brown and Garlington as his counsel, continuing

to pay their legal fees, and accepting their legal advice and acting on it, including

the manner in which the Credit Suisse Transaction loan proceeds were used and

entering into the MSA.

109.   Mr. Blixseth was not aware that Mr. Brown and Garlington were

making misrepresentations and material omissions to him during the relevant time

period.

110.   As a proximate result of Mr. Brown and Garlington's material

misrepresentations and omissions, Mr. Blixseth has suffered and continues to

suffer damages in an amount be determined by this Court but in excess of $375,000,000.

111.   In doing the acts alleged herein, Mr. Brown and Garlington acted willfully, maliciously, intentionally or in the alternative, recklessly and in conscious disregard of the known risks to Mr. Blixseth presented by their willful suppression of the facts indicating their negligence and Plaintiff is therefore entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### (Equitable Indemnity Against Mr. Brown and Garlington)

112.   Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as though restated herein.

113.   As a result of Mr. Brown's and Garlington's acts and omissions, Mr. Blixseth has been subjected to claims in several adversary proceedings, including AP-14, 15, 18, 64, 65 and 88.  If Mr. Blixseth is found liable in any of those adversary proceedings, such liability is based upon the active and primary negligence and concealment of Mr. Brown and Garlington.  Therefore, Mr. Blixseth is entitled to complete and total indemnification by Mr. Brown and Garlington from any liability of any kind which may be imposed upon Mr. Blixseth in connection with any adversary proceedings related to or arising out of

the Credit Suisse Transaction and/or the MSA, including reasonable attorney's fees.

114.   Mr. Blixseth hereby demands that Mr. Brown and Garlington acknowledge their responsibility to fully, completely and totally indemnify Mr. Blixseth from all such liability that is or may be imposed upon him in connection with the Credit Suisse Loan Transaction or the invalidity of the release contained in the MSA.

## SIXTH CAUSE OF ACTION

### (Comparative Indemnity Against Mr. Brown and Garlington)

115.   Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as though restated herein.

116.   If Mr. Blixseth is found to be legally responsible for any damages in connection with or arising from Credit Suisse Transaction and/or the MSA, the negligent and fraudulent actions of Mr. Brown and Garlington contributed to the damages which were sustained by Mr. Blixseth.

117.   Therefore, Mr. Blixseth is entitled to judgment over and against Mr. Brown and Garlington for comparative indemnity by reason of the negligence or other concealment by them.

## SEVENTH CAUSE OF ACTION

### (Contribution Against Mr. Brown and Garlington)

118.   Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as though restated herein.

119.   If Mr. Blixseth is found to be legally responsible for damages as a result of the use of the Credit Suisse Transaction loan proceeds and/or consummation of the MSA, the negligent and/or fraudulent actions of Brown and Garlington contributed more than 50% to the damages which were sustained by Mr. Blixseth.

120.   Therefore, Mr. Blixseth is entitled to judgment over and against Mr. Brown and Garlington for contribution by reason of the negligence or other concealment by them.

## EIGHTH CAUSE OF ACTION

### (Malpractice for Failing to Disclose Conflict of Interest Against Mr. Brown and Garlington)

121.   Mr. Blixseth realleges and incorporates herein by reference the allegations contained in the preceding paragraphs as those restated herein.

122.   In connection with representing Mr. Blixseth during negotiations related to the divorce and MSA, Mr. Brown and Garlington had a direct and actual

conflict of interest in violation of Montana Rule of Professional Conduct 1.7 with respect to Mr. Blixseth personally and the Yellowstone Club entities.

123.   Mr. Brown and Garlington represented Mr. Blixseth personally during the divorce and MSA negotiations, but also represented the Yellowstone Club entitles as interested parties to the divorce and negotiated, reviewed, edited and approved the waivers and releases of liability given by the Club entitles to Mr. Blixseth as part of the MSA.

124.   As such, and pursuant to Montana Rule of Professional Conduct 1.7 and the applicable standard of care for licensed attorneys in the State of Montana, Mr. Brown and Garlington owed a duty to fully inform Mr. Blixseth of this conflict of interest inherent in their concurrent representation of him and Yellowstone Club entities, and to proceed with such concurrent representation only after obtaining informed consent in writing from Mr. Blixseth.

125.   Mr. Brown and Garlington breached this duty by failing to inform Mr. Blixseth of their concurrent conflict of interest and failing to explain to Mr. Blixseth the ramifications of such a concurrent conflict of interest, yet nevertheless proceeded to represent both without their informed written consent.

126.   The aforementioned waivers and releases were a material part of the MSA and without which, the MSA would not have been consummated and Mr.

Blixseth would not have turned over ownership and control of the Yellowstone

Club to Edra Blixseth as part of their divorce.

127.   Had Mr. Brown and Garlington informed Mr. Blixseth of the conflict

of interest between him personally and the Yellowstone Club entities in connection

with their dual representation during the divorce and MSA negotiations, Mr.

Blixseth would have retained different and competent legal counsel who would

have advised Mr. Blixseth that the waivers and releases could be set aside as

fraudulent transfers and potentially exposing Mr. Blixseth to hundreds of millions

of dollars in liability.

128.   Mr. Brown and Garlington in fact did not advise Mr. Blixseth of this

risk.  Yet, such a risk would have frustrated the very purpose of the waivers and

releases and Mr. Blixseth would accordingly not have consummated the MSA

which turned over ownership and control of the Yellowstone Club to Edra Blixseth

and shortly thereafter resulted in the Yellowstone Club with Mr. Brown as

Chairman of the UCC successfully suing Mr. Blixseth to set aside the waivers and

releases in the U.S. Bankruptcy Court for the District of Montana.

129.   As a proximate result of Mr. Brown's and Garlington's breach,

Plaintiff has suffered and continues to suffer damages in an amount to be

determined by this Court but in excess of $375,000,000, together with all appropriate punitive and exemplary damages.

## MR. BLIXSETH REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants and each of them, as follows:

1.      For compensatory damages to be determined according to proof at the time of trial;

2.      For any and all consequential damages to be determined according to proof at the time of trial;

3.      For punitive and exemplary damages to be determined according to proof at the time of trial;

4.      For full indemnification for all attorney's fees and any judgment rendered against Plaintiff in connection with, among others, Adversary Proceeding Nos. 09-0014, 09-0018, 09-0064, 09-0065, 09-0088 and 10-0015 in the U.S. Bankruptcy Court for the District of Montana and Cause No. CV-11-08283 in the U.S. District Court for the Central District of California;

5.      For interest at the maximum legal rate on all sums awarded;

6. For costs of suit incurred herein, including reasonable attorney's fees; and

7. For such other and further relief as this Court deems just.

DATED this 10th day of July, 2017.

DOUBEK, PYFER & FOX, PC

By: _____

John C. Doubek

*Attorney for Plaintiff, Timothy L. Blixseth*